# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

―――――――――――――

### No. ACM S32696

―――――――――――――

### UNITED STATES
*Appellee*

**v.**

### Seth M. NIX
Senior Airman, U.S. Air Force, *Appellant*

―――――――――――――

Appeal from the United States Air Force Trial Judiciary

Decided 16 September 2022

―――――――――――――

*Military Judge*: Charles G. Warren.

*Sentence:* Sentence adjudged on 3 March 2021 by SpCM convened at Joint Base San Antonio-Lackland, Texas. Sentence entered by military judge on 19 April 2021: Bad-conduct discharge, confinement for 135 days, reduction to E-1, and a reprimand.

*For Appellant:* Major Kasey W. Hawkins, USAF; Major Sara J. Hickmon, USAF.

*For Appellee*: Lieutenant Colonel Amanda L. K. Linares, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and GOODWIN, *Appellate Military Judges*.

Judge GOODWIN delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

―――――――――――――

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

―――――――――――――

GOODWIN, Judge:

A military judge sitting as a special court-martial convicted Appellant, contrary to his pleas, of one charge and one specification of assault consummated by a battery in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[1] The adjudged and approved sentence consisted of a bad-conduct discharge, confinement for 135 days, reduction to the grade of E-1, and a reprimand.

In this appeal, Appellant raises one assignment of error with six underlying allegations that trial defense counsel was constitutionally ineffective during his representation of Appellant by failing to: (1) object to improper findings testimony; (2) call a defense expert witness; (3) object to admission of incomplete personnel records; (4) object to an improper victim impact statement; and (5) investigate favorable defense witnesses. In addition, Appellant claims (6) trial defense counsel's "misplaced concern for the named victim amounted to an actual conflict of interest which adversely impacted his representation" of Appellant by withdrawal of a valid objection during sentencing.[2] Although the rationale given by trial defense counsel to explain his advocacy during sentencing is perplexing, Appellant has not shown that any of his allegations constituted a deficiency of a constitutional scale or error that materially prejudiced his substantial rights. We thus affirm the findings and sentence.

## I. BACKGROUND

During the relevant period, Appellant's wife (JN) was a noncommissioned officer (NCO) and the named victim of the assault consummated by a battery of which Appellant was convicted. On 23 November 2018, Appellant and JN

---

[1] Unless otherwise specified, all references in this opinion to the punitive articles of the UCMJ are to *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*); all other references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*). *See* Exec. Order 13,825, §§ 3 and 5, 83 Fed. Reg. 9889, 9890 (8 Mar. 2018). Appellant was acquitted of one specification of communicating a threat charged as a violation of Article 115, UCMJ, 10 U.S.C. § 915 (2019 *MCM*).

[2] Appellant initially raised issues (1) through (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). After the court granted the Government's motion to attach trial defense counsel's declaration responsive to these claims, Appellant filed a reply brief raising the sixth issue and explaining these issues were no longer raised pursuant to *Grostefon* because of information in that declaration. This sixth issue is an extension of the fourth and we address them together.

hosted a "Friendsgiving"[3] potluck at their home. JN's parents attended the potluck, as did JN's best friend DL and four other friends, including GC, an NCO in the Army. Except for JN's parents, all guests drank alcohol. JN consumed less alcohol than her guests because she was breastfeeding. As the evening grew later, guests began to leave. Around midnight, DL became nauseated and went to the guestroom where she waited for her boyfriend to arrive. Appellant and JN disagreed whether it was a good idea for DL to leave with her boyfriend, as opposed to spending the night in the guestroom. Appellant became angry with JN because he thought it was irresponsible of her to have given the boyfriend their address and to allow DL to leave with someone who was a stranger to them. DL's boyfriend arrived in the early morning hours of 24 November 2018 and joined DL in the guestroom.

JN testified she went to bed alone around 0230. At approximately 0300, JN awoke to a "cooling sensation" and found Appellant pouring two bottles of water on her. JN got up and pushed Appellant away. Appellant told her "he wasn't going to sleep because there was a strange man in the house" and so she "wasn't going to [sleep] either." JN felt pain on the left side of her face and realized she was bleeding. She heard Appellant say, "I can't believe I did that." JN went into the bathroom and saw bleeding from a "big gash" on the left side of her face. JN rinsed the injury, glued it closed using skin glue, and cleaned up the bed linens. JN testified she did not seek medical attention because she "didn't want anybody to know" what happened and "didn't want [Appellant] to get in trouble."

From the guestroom, DL heard Appellant and JN arguing in their bedroom and what she described in her testimony as a "big crack." DL went to Appellant and JN's bedroom and saw JN holding her face with her hand. JN removed her hand and DL saw that her friend's face was bleeding. DL asked Appellant, "What the f[**]k did you do?" Appellant responded, "[I] didn't mean to." Appellant later told DL that he felt justified hitting his wife because she "was acting like a whore."

Before DL left with her boyfriend, she tried unsuccessfully to convince JN to call the police and go to the hospital. JN did not call the police or otherwise report the incident and asked DL not to tell anyone what happened. DL and her boyfriend left after the incident, and JN went back to bed. JN awoke when their infant awoke. Appellant also was in their bed, woke up, looked at JN, and

---

[3] According to merriam-webster.com, "Friendsgiving is a blend of friend and Thanksgiving, and it refers to a large meal eaten with friends either on or near Thanksgiving." MERRIAM-WEBSTER, *Friendsgiving,* https://www.merriam-webster.com/dictionary/Friendsgiving (last visited 26 Aug. 2022).

said, "I can't believe you made me do that." JN testified she apologized to Appellant. JN testified she requested leave so coworkers would not see her facial injury. The day after the incident, Appellant pointed to his right knuckle and told JN that it hurt.

In late December 2018 or early January 2019, JN had a headache and sneezed. After she sneezed, JN felt a sharp pain and suffered a nosebleed that was difficult to stop. As a result, JN sought medical attention. During her medical examination, providers noted several injuries to JN's face, including a "[m]inimally displaced fracture of the anterior wall [of] the left maxillary sinus" and "overlying soft tissue injury," which appeared "improved." Medical personnel asked JN to explain her injuries and she told them that she had gotten into a fight with a woman. JN testified that she gave this false explanation of her injuries so Appellant would not get into trouble for the "Friendsgiving" assault.

JN's injuries took between six and eight months to heal. However, at the time of her testimony, she reported continuing pain and numbness on "the left side of [her] face on certain spots."

## II. DISCUSSION

### A. Law

The Sixth Amendment[4] of the United States Constitution guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or

---

[4] U.S. CONST. amend. VI.

forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if appellant's allegations are true, is there a reasonable explanation for counsel's actions; (2) if appellant's allegations are true, did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362; *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations omitted). Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome," instead it must be "a probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

**B. Analysis**

In response to Appellant's assignment of error, the court attached a declaration of trial defense counsel to the appellate record. Considering this declaration along with the assertions Appellant makes in his assignment of error and Appellant's own declaration, we conclude Appellant has not met the required showing of prejudice.[5]

**1. Failure to Object to Improper Findings Testimony**

Appellant alleges that trial defense counsel was constitutionally ineffective by failing to object to JN's testimony regarding the lingering pain in her face and to GC's testimony about his personal morals.

With respect to the former claim, the military judge *sua sponte* announced that victim impact was irrelevant during the findings portion of the court-martial, and that he would only consider JN's testimony regarding lingering pain for the limited purpose of establishing that an injury may have occurred. With regard to the latter claim, GC testified in findings that he visited with Appellant approximately one week after the Friendsgiving. During the visit, Appellant admitted hitting JN in the face. In response to trial counsel asking GC

---

[5] We considered the declarations in accordance with *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (observing a Court of Criminal Appeals is allowed to accept affidavits "when necessary for resolving claims of ineffective assistance of trial defense counsel . . . when those claims and issues are raised by the record but are not fully resolvable by the materials in the record") (citation omitted)).

why he remembered this conversation, GC explained it really upset him because "it goes against [his] morals . . . a man is never to hit a woman."[6] Trial defense counsel did not object to this testimony. However, the military judge, again *sua sponte*, announced that the court would not consider GC's "moral judgments for anything other than [GC's] assertion of why he remembers" the conversation. Appellant acknowledges that the military judge stated on the record that the court would give limited consideration to the testimonies in question.

Even if we assume both testimonies were improper and trial defense counsel should have objected, Appellant was not prejudiced because the record clearly shows neither testimony was considered by the trier of fact for the purpose that Appellant now claims is objectionable. Consequently, assuming trial defense counsel was deficient by failing to object, Appellant has not shown that the outcome of his court-martial would have been different. We also note that if trial defense counsel had objected, the military judge would have heard the testimonies to determine their relevance and rule on those objections. Here, the military judge considered both testimonies, and his decision to *sua sponte* limit the relevance of each was the equivalent of sustaining an objection.

### 2. Failure to Call a Defense Expert Witness

Appellant next alleges that a defense expert in oral and maxillofacial surgery could have rebutted the Government's theory that Appellant caused JN's injuries by striking her with his hand. Appellant contends that this expert would have testified the force that caused JN's injuries was the equivalent of a car crashing into a wall at 40 miles per hour. Appellant argues that this testimony would have shown that he could not have caused JN's injuries and thereby created reasonable doubt.

In his declaration, trial defense counsel explains his rationale as follows:

> [A]fter speaking with [Appellant] and reviewing documentation, I made the decision to request an expert in psychology based on the fact [Appellant] maintained the position that he did not remember what occurred after pouring water on his ex-wife and that he came to in a closet. Between the conversations with our expert [in psychology] and the conclusions made by the court after the results of the sanity board, the proposed explanation appeared to have limited effective range. In a best[-]case scenario

---

[6] GC continued, "Regardless of the situation, you should always remove yourself from the situation. Even if that means that she is still hitting on you . . . there's no need to hit a woman. To me personally, that's against my moral ethics."

a maxillofacial expert could provide information on how an injury occurred, but definitely attributing an injury to a single action is unlikely, and our case lacked surrounding context to make any alternative injury origin theories reasonable. A worst[-]case scenario [of] requesting such an expert would only provide the Government with multiple opportunities with an expert to further bolster [its] case.

As discussed above, we will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). Appellant bears the burden to demonstrate both deficient performance and prejudice. *Id*. (citation omitted). Trial defense counsel's decision here constituted a strategic decision regarding which defenses to mount. This decision was reasonable and also avoided the possibility of enabling the Government to bolster its case through cross-examination of a defense expert at the expense of presenting expert testimony of limited defense value. We do not second guess this decision and find neither deficient performance nor prejudice.

### 3. Failure to Object to Incomplete Personnel Records

During sentencing, the Government offered a letter of counseling (LOC) that was given to Appellant a year after the assault. Appellant received the LOC for not performing duties and leaving his place of duty without authorization. The LOC did not include Appellant's written response. Appellant claims for the first time on appeal that his response, if admitted, "would have mitigated the negative connotations of the adverse paperwork and would have resulted in a more favorable sentence from the military judge."

In his declaration, trial defense counsel admits he made a mistake by not objecting to the LOC on the basis that the exhibit did not include Appellant's written response. The Government concedes that trial defense counsel failed to object to the incomplete LOC during the sentencing phase of the court-martial. Appellant states his written response would have mitigated the counseling but fails to identify how or explain why. The written response was not included in a post-trial declaration of Appellant and is not before the court.

We are persuaded by the Government's argument that Appellant has not suffered, much less shown, any prejudice. We are convinced the military judge did not give significant weight to the LOC in determining Appellant's amenability for rehabilitation. It is unlikely that the military judge as the sentencing authority was persuaded to adjudge a harsher sentence because of Appellant's unrelated failure to perform duties and for leaving his place of duty without authorization.

To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient and that

this deficiency resulted in prejudice. *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). Appellant has not borne this burden here; consequently, we find no error.

### 4. Failure to Object to Victim Impact Statement

During sentencing and before JN delivered her three-page victim impact statement, trial defense counsel objected that some parts of the impact statement fell outside of that allowed. The military judge recited the rules applicable to victim impact statements[7] and asked trial defense counsel to specify which portions of the statement he considered impermissible. Trial defense counsel then withdrew his objection. Thereafter, the military judge emphasized that the court was well-versed in the admissibility of victim impact statements and would be able to "parse the permissible from the impermissible."

Appellant contends trial defense counsel's withdrawal of a valid objection to the victim impact statement fell "measurably below the performance standards ordinarily expected of fallible lawyers," because the inadmissibility of "large portions of JN's victim impact statement" should have been obvious to even inexperienced counsel, and because the military judge highlighted the boundaries of impact statements just before trial defense counsel withdrew his objection. Appellant argues this alleged failure prejudiced him because he presumes the court considered inadmissible information and because the objection's withdrawal waived the issue on appeal.

In his declaration, trial defense counsel states:

> With withdrawing a valid objection to the victim impact statement, in the moment I was cognizant of the fact that JN was without a Special Victims' Counsel and that it was likely she could perceive sustained objections as an attempt to "silence her," therefore reflecting poorly on the parties or the institution of military justice as a whole. Coupled with my own internal frustrations at being unable to relay my objection clearly without taking the unsworn line by line, I withdrew my objection believing the military judge capable of discerning what was and was not appropriate for consideration at that time.

Based on this explanation, Appellant argues trial defense counsel "abdicated his responsibility to zealously advocate for his client . . . plac[ing] concern

---

[7] The military judge stated he relied in part on the 2016 *MCM* because "the charged misconduct occurred prior to 2019." We note this part of the rule did not change after 2019: victim impact statements are limited to "financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001(c)(2)(B); R.C.M. 1001A(b)(2) (2016 *MCM*).

for the named victim's feelings, and her perceptions about the parties and the military justice system above the best interests of his client." Appellant asserts that this abdication constituted an actual conflict of interest which deprived Appellant of his Sixth Amendment right to counsel. Appellant alternatively argues that, if we do not find an actual conflict of interest, then we should find that this abdication undermines the presumption of trial defense counsel's competence. For the reasons stated below, we find Appellant is not entitled to relief on this issue.

"[M]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Rapert*, 75 M.J. 164, 170 (C.A.A.F. 2016) (alteration in original) (quoting *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007)). Here, we not only presume the military judge knew the law, but the military judge cited the rule on the record and said he would follow it. Appellant provides no evidence to the contrary. Consequently, we find no proof of prejudice from trial defense counsel's withdrawal of his objection to portions of the victim impact statement.

Like Appellant, we question the logic behind trial defense counsel's decision to withdraw his objection. On this record, we are disinclined to give much weight to the claim that a lengthy evidentiary objection during the sentencing phase of a court-martial would cause a victim to feel silenced, or either the victim or general public to view the military justice system poorly. We also question why trial defense counsel made a tactical trial decision based on the victim's potential feelings and how such a decision might reflect poorly on the military justice system. However, we must place this decision in context. Regardless of his thought process, trial defense counsel withdrew an evidentiary objection during judge-alone sentencing, after the military judge had cited the applicable rule, and he did not renew his objection after the military judge conveyed that he would not consider any improper portions of the victim statement. In context, trial defense counsel cannot have prejudiced Appellant.

We have carefully considered Appellant's assertion that trial defense counsel's rationale for withdrawing this objection shows an actual conflict of interest and find that this contention does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We also reject Appellant's alternative argument that trial defense counsel's rationale overcomes the presumption of competence and shows that trial defense counsel's representation was wholly ineffective. Trial defense counsel filed numerous motions prior to trial, including a motion to dismiss for failure to state an offense. Trial defense counsel objected to the Government's motion to preadmit evidence; as a result, the Government withdrew proposed video evidence. The Government filed a pretrial motion in limine requesting the military judge preclude evidence of child protective services' (CPS) investigation into JN. Trial

defense counsel's response persuaded the military judge to permit cross-examination on this topic for potential bias. Trial defense counsel filed a supplemental motion to continue the trial date, in part because of the Government's untimely disclosure of an expert witness in maxillofacial surgery. Although the military judge denied Appellant's requested continuance, he precluded the Government from calling the expert in the findings phase of the trial. The military judge also cited, on the record, trial defense counsel's "robust and frequent motions filing."

Trial defense counsel lodged several evidentiary objections during the court-martial, including sustained hearsay objections and an objection to testimony regarding JN's restricted report to family advocacy. The military judge sustained this objection and struck the testimony. Later, trial defense counsel again objected to a line of redirect questioning on the same topic, to which the military judge responded by stating that it would only be considered for its limited purpose of showing how the military investigation was initiated.

Trial defense counsel's thorough cross-examination of JN included the following topics: her failure to report the incident to law enforcement; her inconsistent statement to her supervisor that she had been in a fight, and her failure to correct that statement for over two years; whether she had told her parents that she had fallen and hit something (she stated she did not recall this); and multiple inconsistent statements to medical providers. Trial defense counsel also impeached JN for potential bias stemming from Appellant's report to CPS that JN had abused or neglected their child. During cross-examination, trial defense counsel elicited an admission that JN had reported the assault to the local Air Force Office of Special Investigations after she learned CPS was investigating her.

Trial defense counsel's cross-examination of DL included the following impeachment: DL previously served as JN's maid of honor; DL was taking painkillers from surgery at the time of the incident and was ill that evening; and DL never actually saw Appellant hit JN. Despite his questionable logic in deciding to withdraw his objection to the impermissible portions of the victim impact statement, trial defense counsel provided Appellant with thorough representation.

### 5. Failure to Investigate Favorable Defense Witnesses

Appellant asserts in his declaration that he provided trial defense counsel with names of several witnesses who would have testified favorably on his behalf during both the findings and sentencing portions of his court-martial. These witnesses were an unnamed medical case manager and two of Appellant's friends. Appellant argues his counsel's failure to call these witnesses prejudiced him. Appellant, however, fails to provide any detail regarding what, if anything, these witnesses would have said if they were called to testify or

provide a statement on his behalf. Consequently, Appellant has not shown any deficiency resulted in prejudice. *Captain*, 75 M.J. at 103.

### 6. Conclusion

In addition to the above, trial defense counsel secured for Appellant an acquittal on Charge I and its specification. Given trial defense counsel's thorough, if less than perfect, representation of Appellant, we find Appellant was neither deprived of a fair trial nor was the trial outcome unreliable. *See Strickland*, 466 U.S. at 696. While we may question one part of trial defense counsel's rationale when he withdrew his objection to the victim impact statement, we conclude that trial defense counsel's overall level of advocacy did not fall measurably below the performance ordinarily expected of fallible lawyers. Therefore, we conclude from our review of the record and all post-trial declarations that Appellant was not denied constitutionally effective assistance of counsel. Accordingly, and for the reasons given, we find Appellant's claims do not warrant relief.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court